**3:23-mj-00199**

DISTRICT OF OREGON: ss, AFFIDAVIT OF BOBBY GUTIERREZ

# Affidavit in Support of a Criminal Complaint

I, Bobby Gutierrez, being first duly sworn, hereby depose and state as follows:

## Introduction and Agent Background

1. I am a Special Agent with the Federal Bureau of Investigation and have been since January 2021. I am currently assigned to the FBI's Portland Division and am part of the Transnational Organized Crime and Violent Gang Squad. I presently work a variety of criminal and national security matters, including the investigation of violent crimes, gangs and narcotics, in addition to the apprehension of federal fugitives. During my 21-week training at the FBI Academy in Quantico, Virginia, I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. In my current area of responsibility, I work with law enforcement officers who have experience and training in investigating coded communication involving the distribution of controlled substances and gang affiliations. I have used this training and experience, as well as the training and experience of other law enforcement officers familiar with this investigation, to demonstrate how these criminal enterprises plan, organize and carry out criminal activity.

2. Prior to being employed with the FBI, I was a Licensed Master Social Worker (LMSW) in the state of Arizona for approximately six years. As a LMSW, I was responsible for creating and implementing target treatment plans for court-ordered criminal offenders with a chronic history of substance use disorders, domestic violence, and child abuse. In addition to my employment as an LMSW, I was a behavioral health consultant for Medicare/Medicaid and oversaw medical and mental health treatment for patients residing in assisted living homes and

skilled nursing facilities. As a consultant, I was responsible for auditing medical treatment plans, levels of care, and medications to include psychotropic and Schedule II narcotic pain medications.

3. This affidavit is based upon a joint investigation conducted by the Clackamas County Interagency Task Force (CCITF), the Westside Interagency Narcotics Task Force (WIN), the Federal Bureau of Investigation (FBI), and the U.S. Attorney's Office.

## Purpose of Affidavit

4. This affidavit is submitted to support a criminal complaint and arrest warrant for **Cristhian MARTINEZ**, a Hispanic male, date of birth 01/xx/2005 (hereinafter referenced as "**MARTINEZ**") for committing the crimes of Manufacturing, Distributing, and Possessing with Intent to Manufacture and Distribute 400 grams or more of a mixture and substance containing Fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(A) and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924(c).

5. I have obtained the facts set forth in this affidavit through my personal participation in the investigation described below; from oral and written reports of other law enforcement officers; and, from records, documents and other evidence obtained during this investigation. I have obtained and read official reports prepared by law enforcement officers participating in this investigation and in other related investigations.

### *Confidential Informant*

6. A Confidential Informant, hereinafter referred to as CI, is working with the Clackamas County Interagency Task Force and has provided actionable information to law enforcement in exchange for consideration on their pending federal criminal charges involving the Distribution of Fentanyl and Possession with the Intent to Distribute Fentanyl, in violation of 21

U.S.C. § 841(a)(1), and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c). No promises or guarantees were made by investigators to gain the CI's cooperation. The CI has an attorney. The CI has also provided information to CCITF against their own penal interests. The CI stated they had been involved in both using and selling drugs for more than ten years. The CI has misdemeanor and felony convictions for Unauthorized Use of a Vehicle, Possession of Stolen Vehicle, Manufacturing Heroin, Delivery of Heroin, Possession of Heroin, Theft II, and Offensive Littering. The CI has provided investigators information that they have been able to independently verify. Based on the above information, I believe the CI to be reliable to the extent he/she has been corroborated.

## **Statement of Probable Cause**

### *Background on Investigation*

7. In September 2023, CCITF investigators were called to investigate an overdose that occurred in Clackamas County, Oregon. While processing the scene, investigators discovered numerous counterfeit M30 Oxycodone pills believed to be manufactured with fentanyl and fentanyl powder and believed that the decedent died as a result of a fentanyl overdose. Using various investigative techniques, investigators were able to identify the decedent's dealer and discovered that this dealer was operating in downtown Portland, Oregon.

8. Shortly after this discovery, investigators set up a control buy in downtown Portland and arrested the decedent's dealer (hereinafter referred to as the level 1) with narcotics and a firearm. During the post-*Miranda* rights interview, the level 1, provided information regarding their dealer and told investigators that their dealer was a young Honduran male who went by the name of "Chris" (also known as the level II in the overdose investigation). Per the CI, Chris was the one who sold the CI the fentanyl that they then sold to the decedent. Investigators

learned that Chris was a fentanyl dealer in Portland, Oregon who was capable of delivering counterfeit M30 Oxycodone pills (containing fentanyl) and fentanyl powder. Fentanyl is a Schedule II controlled substance.

9. CI told investigators that during the course of the past 18 months, the CI had made multiple drug purchases from Chris. In those 18 months, the CI estimated they bought 30 to 50 pounds of fentanyl powder and at least 100,000 counterfeit M30 pills (manufactured with fentanyl) from the Chris within the greater Portland, Oregon metropolitan area. The CI also reported that Chris was responsible for shooting a person in downtown Portland, Oregon and that Chris regularly carries guns while dealing fentanyl. The CI provided two cell phone numbers and said they would call either one to get a hold of Chris. CI said that Chris had only changed his number once and that was around July 2023. Since then, the CI has used both cell phone numbers to order and set up drug deals with Chris. The CI stated they would regularly call Chris to buy fentanyl.

**Controlled Buy**

10. During the month of November 2023, CCITF Deputy Drakos and I, met with the CI in person for the purpose of conducting a controlled purchase of fentanyl from Chris, known to the CI as their fentanyl source of supply. Upon meeting the CI, and with their consent, they were searched for weapons, money, and drugs. None of the previous items were located.

11. At the direction of investigators, the CI called Chris' cell phones to purchase narcotics, specifically M30 pills and fentanyl powder. CI spoke with Chris who was using one of the phones and agreed to meet at a set location to conduct the deal in downtown Portland, Oregon. Following this conversation, investigators staged in the area of the pre-determined location.

12. The CI was directed to walk to the agreed-upon meeting location. When the CI walked to the meeting location, investigators kept the CI under consistent audio and/or visual

surveillance. The CI walked directly to the meeting location and made no stops or contacts along the way. The CI walked to the area of the deal location, where CCITF investigators and surveillance technology were able to observe the CI and the drug transaction.

13. A short time later, the SOS walked up and met with the CI. The electronic transmitter provided to the CI began picking up a conversation. The CI provided Chris with the pre-recorded buy funds and completed the transaction for an amount of fentanyl powder and M30 pills.

14. After the CI and Chris parted ways, the CI was followed to a pre-determined nearby parking lot, keeping them under constant audio and/or visual surveillance. The CI walked directly to this location and made no stops or contacts along the way.

15. When Deputy Drakos and I met with the CI, the CI immediately provided investigators more than 40 grams of both fentanyl powder and M30 pills, The fentanyl powder field tested positive for fentanyl. The M30 pills have not yet been analyzed. The CI confirmed they purchased the fentanyl from Chris. The CI provided verbal consent for their person to be searched for any weapons, drugs, or money and no contraband was found.

16. Using investigative and surveillance techniques, investigators were able to follow Chris. Chris walked around the area for a couple of hours and was seen making a few more hand-to-hand deals which investigators know to be consistent with fentanyl deals. Eventually, Chris returned to his vehicle. Investigators were able to follow Chris to a residence in Clackamas County. Chris returned straight to that location and did not make any stops along the route.

17. Investigators noted that the vehicle and Chris arrived at 17401 Webster Rd. Gladstone, Oregon (hereinafter, "Target Location") which is an apartment complex with the name "Los Verdes Estates." Once Chris got out of the vehicle, investigators followed and noted that

Chris entered apartment 8. Investigators also noted that the lights inside came on once Chris entered the Target Location.

18. The following day, investigators went back to the Target Location and noted that the vehicle in which Chis was previously seen in was still parked in the same location which subsequently had the number "8" assigned to the parking space. The images below capture the vehicle parked in the designated "8" spot:



19. The narcotics that Chris delivered to the CI tested presumptively positive for fentanyl using a MobileDetect field testing kit, which I know from experience is a reliable way to test for the presence of controlled substances. The narcotics were placed into a CCSO property locker. These narcotics were submitted to the OSP crime lab for further analysis, waiting results.

*Court Authorization for Target Phones*

20. On November 15, 2023, United States Magistrate Judge Jeffery Armistead, signed a court order in the District of Oregon, authorizing the geolocation and cell site for the two Cellphones (also known as the Target Cellphones) known to be utilized by Chris to conduct his drug deals.

21. In the early hours of November 16, 2023, investigators began to receive geolocation notifications from both of the Target Cellphones showing both phones believed to be utilized by Chris moving north from California and into the state of Oregon. I know from training and experience, interviews with targets and conversations with other law enforcement officers that, drug traffickers often travel south towards California to purchase and replenish their drug supply. CI also previously told us that Chris travels to California to resupply himself with fentanyl every two weeks. I know that these drug traffickers often go south because the price of narcotics, specifically fentanyl powder and M30 fentanyl pills, are cheaper to buy which can then be sold at a higher market value here in Oregon.

22. After noticing the geolocation data indicated that the phones were coming north into Oregon, investigators began to travel south to catch up with the phones and attempt to find Chris and the blue BMW mentioned above that was identified during the control buy in early November. Investigators shortly thereafter were able to locate a blue BMW and positively identified it as the target blue BMW.

23. Investigators followed the vehicle and conducted a traffic stop of the blue BMW in the area of Gladstone, Oregon, just outside of Portland, Oregon, and detained four Hispanic males from the BMW. The driver, who was identified as "**Cristhian MARTINEZ**" with a date of birth of January xx, 2005.

24. During a K-9 sweep of the blue BMW, Washington County Deputy Michael Colburn, utilizing K-9 unit "Mando,"[1] received a positive alert for the presence of narcotics in the vehicle. The vehicle was searched and investigators found multiple packages hidden behind the radio console wrapped in duct tape. Investigators opened the packages and discovered a white substance in brick form within them. A field test conducted of these narcotics tested positive for fentanyl, as Schedule II controlled substance. Below are photos of the packages of compressed white powder seized at the traffic stop. The three packages found behind the radio console weighed approximately 812.5 grams: A fourth package of fentanyl found underneath the carpet in the trunk weighed approximately 189 grams.



[1] Mando is a 4-year-old German Shepherd/Belgian Malinois mix. Mando and Deputy Colburn are a certified narcotic detection team through the Oregon Police Canine Association (OPCA) with a certification date of 04/14/2023, and the California Narcotic Canine Association (CNCA) with a certification date of 2/10/23. Mando and Deputy Colburn participated and completed a 264 hour narcotic detection school. They continually train a minimum of 16 hours a month. Mando is trained to locate and alert on the odor of Cocaine, Methamphetamine, Heroin, and Fentanyl. He is a passive alert dog which means his final response is to down and stare as a passive alert but still will sometimes scratch at the source of odor.



25. Following this discovery, the driver, (hereinafter "**MARTINEZ**") was read his *Miranda* rights and he agreed to talk to investigators. After being briefed about the investigation, **MARTINEZ** told investigators that he was staying at the apartment known to investigators as the "Target Location" whom he was sharing with another male individual. The CI was shown a picture of **MARTINEZ** and positively identified him as the "Chris" the CI had been purchasing fentanyl from.

26. I was then called by investigators to further discuss the pending investigation with **MARTINEZ** and I offered to speak to **MARTINEZ** in Spanish. I am native Spanish speaker and informed **MARTINEZ** of the investigation. I confirmed with **MARTINEZ** if the Target Location was his place of residence, he told investigators it was as he had been sleeping there. I then asked **MARTINEZ** if he would consent for a search of the Target Location and he agreed. I asked if anything would be there that pertained to him and he told investigators that his birth certificate would be found.

27. Upon receiving consent for a search, investigators traveled to the Target Location and completed a clear of the residence where they entered the residence and walked through it to

make sure it was safe. During the entry, investigators observed in plain view various instrumentalities consistent with drug trafficking and manufacturing. Following this discovery, investigators maintained the scene while a federal search warrant was completed and signed.

*Court Authorization for Target Location*

28. On November 16, 2023, United States Magistrate Judge Jeffery Armistead, signed a court order in the District of Oregon, authorizing the search of the Target Location known as the residence belonging to **MARTINEZ**. During the search of the residence, investigators discovered more instrumentalities consistent with drug trafficking and manufacturing, packaging, M30 fentanyl pills, white powdery substance in baggies, and various firearms and ammunition throughout the residence. Below are photos of items discovered during the search:







29. Various loaded firearms were discovered in the residence to include both bedrooms and the living room of the apartment. Below is also a list of some the items that were discovered and/or seized from the residence:

- 20 Ton Shop Press, which I know is used to press (produce and manufacture) bricks of fentanyl powder for purposes of further distribution;
- Blenders, gas masks and baking trays with a white residue, which I know are used in to mix, produce, prepare, process, and manufacture fentanyl for purposes of further distribution;
- Approximately 5 ounces of white powder, which investigators believe is additional fentanyl powder, and M30 fentanyl pills;

- Containers of Mannitol, which I know is used to mix with fentanyl as a "cutting agent" to prepare, process, and increase the bulk of the mixture and substance containing fentanyl for purposes of further distribution;
- Thousands of dollars in loose U.S. currency
- Approximately 29 boxes of various caliber ammunition;
- Ten (10) handguns; and,
- An AR-15 .22 caliber rifle.

30. I am very familiar with how fentanyl dealers operate and I know that fentanyl traffickers are increasingly selling both bulk fentanyl powder, as well as counterfeit M30 prescription pills that are manufactured with fentanyl, a Schedule II controlled substance. I know that fentanyl powder is typically a white to off-white powder. I also know that the counterfeit pills being sold are designed to replicate real 30 mg Oxycodone pills, which are round, often blue in color, and stamped with an "M" and "30" on them and weigh approximately 1/10th of a gram. I have seen and been involved in the seizure of tens of thousands of these counterfeit M30 pills and both field tests and forensic laboratory analysis conducted on samples of these pills have confirmed the presence of fentanyl within them. I know a typical user of fentanyl will either buy powdered fentanyl or counterfeit M30 pills that they will then burn on a piece of aluminum foil and inhale the fumes. Sometimes a user will simply ingest the pills or inhale the powdered fentanyl as is. Since different weights of powdered fentanyl sell for different amounts, I know that drug dealers selling fentanyl powder will often possess a scale to weigh the amount of powder fentanyl they are selling. I also know drug dealers selling powdered fentanyl, which they possess in bulk/larger amounts, will often possess additional packaging materials to repackage the drugs they are selling to their customer. These M30 pills can sell on the street to a user for as little as .25

cents to .50 cents a pill. Depending on their level of addiction, I know that a typical fentanyl user buying pills may buy and use between one (1) and 20 pills a day, and sometimes more. I know that a user of powdered fentanyl will typically buy it in quantities of less than a gram and use it in quantities of much less than 1/10 of a gram. I also know that dealers of pills will often buy pills in bulk quantities and then repackage the pills into smaller quantities. I know that dealers of powdered fentanyl will often buy fentanyl in larger quantities and then break off and sell it in smaller qualities of a gram or less. I know that a person possessing over 10 grams of either fentanyl pills (counterfeit M30 pills manufactured with fentanyl) and/or fentanyl powder does not possess it for personal use but rather such a quantity clearly indicates that it is possessed for purposes of further distribution.

31. I have been involved in multiple drug missions targeting fentanyl dealers operating in downtown Portland, Oregon where firearms have been recovered and have talked with other investigators who have also been involved in similar missions where firearms have been recovered. I know from my training and experience that drug traffickers possess guns as "tools of the trade" in furtherance of their drug trafficking activities for a variety of reasons, to include: First, having an accessible gun provides defense against anyone who may attempt to rob the trafficker of their drugs or drug profits; Second, possessing a gun, and letting everyone know that you are armed, lessens the chances that a robbery will even be attempted; Third, having a gun accessible during a transaction provides protection in case a drug deal turns sour; Fourth, the visible presence of a gun during the transaction may prevent the deal from turning sour in the first place; and, Fifth, having a gun may allow the drug trafficker to defend the "turf" area, including their residences or "stash houses," from which dealers operate for the trafficker.

**Conclusion**

32. Based on the foregoing, I have probable cause to believe, and I do believe, that **Cristhian MARTINEZ** has committed the crimes of Manufacturing, Distributing, and Possessing with Intent to Manufacture and Distribute 400 grams or more of a mixture and substance containing Fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(A) and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation Title 18, United States Code, Section 924(c). I therefore request that the Court issue a criminal complaint and arrest warrant for **MARTINEZ**.

33. Prior to being submitted to the Court, this affidavit, the accompanying complaint, and the arrest warrant were all reviewed by Assistant United States Attorney Scott M. Kerin. AUSA Kerin advised me that in his opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

*By phone pursuant to Fed R. Crim. P. 4.1*
Bobby Gutierrez Special Agent
Federal Bureau of Investigation

Subscribed and sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 5:40 pm on November 17, 2023.

HONORABLE JEFFREY ARMISTEAD
UNITED STATES MAGISTRATE JUDGE