SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB #965128**
Scott.Kerin@usdoj.gov
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

**UNITED STATES OF AMERICA**

**v.**

**CRISTHIAN MARTINEZ,**
**a.k.a. CHISTHIAN MARTINEZ,**

**Defendant.**

**3:23-cr-00401-SI**

**GOVERNMENT'S SENTENCING MEMORANDUM**

Death warrants a serious sanction. The defendant, though young, was a large-scale and well-armed fentanyl dealer who sold fentanyl that ultimately took the life of a 30-year-old man named Preston – a young man who was a loving father, a loving son, and a loving fiancé.[1] The defendant took the liberties offered by our country, but instead of embracing the American dream, he abused it by actively preying upon the most vulnerable members of our community for his personal profit. To the community and the victim who paid the ultimate price, defendant's

[1] Although the U.S. Attorney's Office does not regularly use victim's names in our sentencing materials the victim's family has asked if we could use Preston's first name in our memorandum and in respect of their wishes, we have done so.

distribution of fentanyl was a dark cloud of death and destruction rolling across the land chewing up everything in its path. Sometimes the nature of the case, the magnitude of the resulting harm, and the callousness with which it is carried out, necessitates such a serious sanction that it will be unequivocal and sufficient to send a clear message to the defendant, other fentanyl dealers, and the community that such conduct will not and shall not be tolerated.

Thus, following his convictions for engaging in a conspiracy to manufacture, distribute, and possess with intent to distribute fentanyl; being an alien unlawfully in possession of nine firearms; and, his admission that he "distributed fentanyl that resulted in the death of an adult male victim," the government asks the Court to impose a total sentence of 210 months' imprisonment (17½ years), to be followed by a five-year term of supervised release. Under the circumstances such a sentence is both reasonable and absolutely warranted. The defendant will also very likely be deported back to Honduras as a result of his conviction.

The pain that illicit fentanyl has inflicted upon the families of our community is incalculable. The individual stories of loss and death are absolutely heartbreaking. One moment a loved one is here and then they are gone forever. The sorrow and pain one feels from the loss of their child, their fiancé, or, in the eyes of a young child, the loss of her father – it is a grief so deep that it defies words. When Preston passed away, not only did his life end, but it also permanently ripped a hole in the lives of those he left behind – hopes, dreams, and futures were forever destroyed. The defendant will someday walk free. Preston's loved ones will never be free of the pain the defendant caused them.

Preston is forever trapped in time because his life was stolen from him by a fentanyl dealer who was selling death – in both pill and powder form. His mother will never again be able to hug and kiss her son, his father and younger brother will never again talk with him about

sports, his fiancée lost her life partner and soul mate, and his young daughter will never again be picked up and loved on by her dad. Although the memory of Preston is one that his family, friends, fiancée, and 11-year-old daughter will always hold dear in their hearts, their souls, and their thoughts, they will always struggle with the loss and despite the words of comfort people will utter, nothing will ever make their pain go away. Their loved one will forever be missing from their lives. Homes will always seem a little quieter. The chair at the kitchen table will forever be empty. Every future family picture will be missing a loved one. Family holidays will always have someone missing.

Family and friends described Preston as one of the kindest and most thoughtful people. He loved and played every type of sport, and everyone got along with him. He was instantly liked by everyone who met him. He was devoted to his family, his fiancée, his daughter, his employer, and his friends. His mom talked with him almost everyday, and every conversation ended with "I love you." His fiancée – who was with Preston for 10-years – still wears her engagement ring, which serves both as a reminder of their love and also a reminder of the devastating loss she and their daughter have suffered. When their daughter asks about her dad, she is told that he is in heaven. Every morning and every evening both Preston's fiancée and his daughter kiss the urn which holds his remains and they tell them they love him.

Unfortunately, nothing will ever bring Preston back because on September 26, 2023, he died as a result of using fentanyl sold by the defendant. The defendant did not directly sell fentanyl to the victim but rather he was a large-scale fentanyl dealer flooding the market with his deadly poison. In doing so, the defendant sold fentanyl to another dealer who in turn sold it to the victim. Preston used the fentanyl and died as a direct result. The medical examiner identified his cause of death as an accident that was the result of acute fentanyl toxicity.

To the defendant, selling substantial quantities of fentanyl was how he made money. He came to our country illegally and instead of seeking a legitimate job he took advantage of the addictions of others and preyed upon them to make money.

This story is tragic. Nothing any of us do will undue the devastation that resulted from the defendant's actions and bring Preston back to life. At sentencing, we will talk about the crime, the victim, the sentencing guidelines, the defendant, and in the end the parties will ask the Court to pass a final judgment. This case tragically highlights the dangers of fentanyl and the absolute devastation that fentanyl dealers like the defendant have unleashed upon the community, the innocent lives they have taken, the smiles they have erased, and the lives they have damaged and destroyed. Quite simply, illicit fentanyl kills. Our country, our community, and this family has suffered greatly because of illicit fentanyl. Whether or not the defendant intended the victim's death does not change the outcome of this case and provides little, if any, solace to the family who lost their loved one.

In selling fentanyl, the defendant chose monetary gain over the risk of death he was imparting onto his customers. The defendant was selling an extremely addictive, destructive, and deadly poison, and he simply did not care about the havoc he wrought. The defendant's interest was not in the people whose lives he placed at risk, but rather in the money he was making.

**A. Summary of Proceedings.**

On May 6, 2026, the defendant pled guilty to Count 1 of the Indictment which charged him with the felony crime of engaging in a Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; and, Count 4 of the Indictment which charged him with Alien in Possession of a Firearm, in

violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(8). On Count 1, the maximum sentence the Court may impose is a term of life imprisonment, fine of $10,000,000, and at least five years of supervised release. There is a mandatory minimum sentence of ten years' imprisonment. There is a $100 fee assessment. On Count 4, the maximum sentence the Court may impose is a term of 15 years' imprisonment, a fine of $250,000, and three years of supervised release. There is a $100 fee assessment.

In his Plea Agreement defendant admitted that:

> The government could prove beyond a reasonable doubt that, starting at an unknown date, but no later than September 1, 2023, and continuing until on or about November 16, 2023, within the District of Oregon, the defendant knowingly and intentionally conspired with others to manufacture, distribute, and possess with intent to distribute 400 grams or more of a mixture and substance containing fentanyl, a Schedule II controlled substance.
>
> Furthermore, as part of this conspiracy, the defendant distributed fentanyl that resulted in the death of an adult male victim. Defendant was in the direct chain of distribution and supplied fentanyl to a co-conspirator who in turn sold that fentanyl to an adult male victim, the adult male victim then used the fentanyl and died as a direct result of using fentanyl that had been distributed by the defendant. The Medical Examiner report determined that the victim's manner of death an accident and the immediate cause of his death was acute fentanyl toxicity.
>
> Additionally, on or about November 16, 2023, within the District of Oregon, the defendant, knowing that he was an alien illegally and unlawfully within the United States, knowingly possessed one or more of the following firearms, to-wit:
>
> 1. Smith and Wesson M&P 15-22, .22 caliber rifle, with serial number WAR6825;
>
> 2. CDM Prod. Inc. .22 short revolver, with serial number 204881;
>
> 3. Taurus Ultra-Light .44 caliber Magnum pistol, with serial number XK 256787;

4. Smith and Wesson SW9V 9mm caliber pistol, with serial number PAU 2034;

5. Springfield XDM Compact 9mm caliber pistol, with serial number MG 813273;

6. Taurus G2c 9mm pistol, with serial number ACG 081872;

7. Glock 19X, 9mm caliber pistol, with serial number BRPW852;

8. Sig Sauer P365 9mm caliber pistol, with serial number 66F808316; and,

9. EIG .38 Special Revolver, with serial number DXQXND.

> The government could also prove beyond a reasonable doubt that these firearms had previously been shipped or transported in interstate or foreign commerce.

Plea Agreement ¶ 6.

A Presentence Report (PSR). The government has no objection to the U.S. Probation Office's summary of the facts underlying the defendant's count of conviction (PSR ¶¶ 25 - 34), Sentencing Guideline calculations (PSR ¶¶ 41 - 51), and prior criminal conduct (PSR ¶ 57).

As the PSR notes, this investigation started on September 26, 2023, when law enforcement investigators were called in response to the overdose death of a 30-year-old male (Preston). The victim lived in Milwaukie, Oregon, in a two-bedroom apartment with his fiancée and 7-year-old daughter. His fiancée heard him come home from work at around 2:00 a.m. The victim worked in a large distribution center and worked long hours to care for his family. At around 5:00 in the morning his fiancée came and checked on him and he was laying down in the living room and appeared to be sleeping. About an hour later she checked on him again and discovered that he was not breathing. She immediately called 9-1-1. Medical personnel and Clackamas County Sheriff's Office deputies immediately responded. Upon arrival the victim

was given Narcan, medicine designed to reverse the effects of an opioid overdose, but it was too late. Preston had already passed away.

At the scene, within a lunch bag belonging to the victim, investigators discovered a plastic bag containing white fentanyl powder and a metal tin containing approximately 20 to 30 blue counterfeit "M-30" pills containing fentanyl. Based upon toxicology results the medical examiner determined that the victim's manner of death was an accident and the cause of death was acute fentanyl toxicity. Toxicology results showed a concentration of 630 ng/mL of fentanyl in the victim's blood. This concentration of fentanyl was astronomical. The toxicology report noted that "[i]n fatalities from fentanyl, blood concentrations are variable and have been reported as low as 3 ng/mL. Postmortem blood fentanyl concentrations ranged from 0.30 – 110 ng/mL (median 11 ng/mL) in 301 femoral blood specimens obtained from accidental drug overdose death investigations. These concentrations ranged from 9.7 – 41.3 ng/mL (median 17.2 ng/mL) in 7 fentanyl only cases in another published case series." NMS Labs, Toxicology Report, November 15, 2023, at 2.

Investigators with the Clackamas County Interagency Task Force (CCITF) and FBI immediately started the investigation to determine where the fentanyl came from. In short order they identified an individual who directly sold the fentanyl to the victim. That individual (referred to as Level 1) was arrested. Level 1 identified the dealer he purchased fentanyl from as the defendant (also referred to as Level 2). Level 1 said that during the previous eight (8) months he had purchased between 30 to 50 pounds of fentanyl powder and at least 100,000 fentanyl pills directly from the defendant for purposes of further distribution. Level 1 also provided Investigators with two phone numbers that he used to contact the defendant.

In November 2023, Investigators used Level 1 to purchase approximately 40 grams of fentanyl powder and pills from the defendant. Following the deal they observed the defendant engage in some additional apparent drug deals and then followed him home to his residence which was an apartment on Webster Road, in Gladstone, Oregon.

On November 15, 2023, Investigators applied for and received a search warrant to obtain geolocation data from the defendant's phone. On November 16, 2023, utilizing this GPS information they learned the defendant had traveled down to California and was driving back north into Oregon. Investigators then reached out to the U.S. Attorney's Office and a plan was made to conduct an interdiction stop of the defendant, who the Investigators believed was transporting fentanyl.

On November 16, 2023, the defendant was stopped in the area of Gladstone, Oregon, just outside of Portland and detained. A police drug detection K-9 conducted a sweep of the vehicle and alerted to the presence of a controlled substance. The vehicle was searched and inside Investigators located four packages of fentanyl weighing approximately 1,001.5 grams and $7,570 in cash. The defendant was arrested. A picture of the fentanyl seized from the car is below:



Investigators applied for, and received, a federal search warrant for the defendant's residence. The defendant also subsequently gave consent to search his apartment in Gladstone.

Inside the defendant's apartment Investigators found a well-equipped location used for the large-scale manufacture and distribution of fentanyl. Inside the apartment they found a 20-Ton Shop Press, which was used to press (produce and manufacture) bricks of fentanyl powder for purposes of further distribution; blenders, gas masks and baking trays with a white residue, which are used to mix, produce, prepare, process, and manufacture fentanyl for purposes of further distribution; approximately five (5) ounces of additional fentanyl powder and M30 fentanyl pills; containers of Mannitol, which is used to mix with fentanyl as a "cutting agent" to prepare, process, and increase the bulk of the mixture and substance containing fentanyl for purposes of further distribution; thousands of dollars in loose U.S. currency; approximately 29 boxes of various caliber ammunition; and multiple firearms, both handguns and a rifle. Pictures of some of the seized items are below:







During an interview the defendant admitted buying and selling fentanyl powder and pills. He told investigators he would buy 1,000 fentanyl pills (counterfeit blue M-30 pills) for $700 and then sell them for about $800 to $900.

**B. Government's Sentencing Guideline Calculations.**

The Court, "in determining the particular sentence to be imposed," is required to consider the "sentencing range established" by the U.S. Sentencing Guidelines. 18 U.S.C. § 3553(a)(4). "The Guidelines are 'the starting point and the initial benchmark,'. . . and are to be kept in mind throughout the process." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting *Kimbrough v. United States*, 552 U.S. 85, 108 (2007)). "All sentencing proceedings are to begin by determining the applicable Guideline range." *Id.*

The defendant pled guilty to two Counts and each has separate guideline calculations.

**Count 1**

On Count 1: Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, the government believes defendant's guideline calculations are as follows:

**Base Offense Level for Drug Offense (30)**

The parties agree that defendant's relevant conduct, based upon the amount of fentanyl seized following his arrest, is between 400 grams and 1.2 kilograms of fentanyl for a Base Offense Level of 30, pursuant to USSG §§ 1B1.3 and 2D1.1(a). PSR ¶ 41, Plea Agreement ¶ 8.

**Firearm Adjustment (+2)**

Because defendant possessed one or more firearms in connection with the offense, pursuant to USSG § 2D1.1(b)(1), the government and U.S. Probation Office believe that defendant's initial Base Offense Level should be increased by two-levels. PSR ¶ 42, Plea Agreement ¶ 9.

**Maintaining Premises to Distribute Controlled Substances (+2)**

The government and U.S. Probation Office believe that because defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance his offense level should be increased by two-levels, pursuant to USSG § 2D1.1(b)(12). PSR ¶ 43, Plea Agreement ¶ 10.

The Adjusted Offense Level is 34.

**<u>Count 4</u>**

On Count 4: Alien in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(8), the government believes defendant's guideline calculations are as follows:

**Base Offense Level (14)**

Because the defendant was a prohibited individual his Base Offense Level on the Alien in Possession charge is 14, pursuant to pursuant to USSG § 2K2.1(a)(6)(A). PSR ¶ 47a.

**Adjustment for Number of Firearms (+4)**

Because the defendant possessed between eight (8) and 24 firearms his offense level should be increased by four-levels, pursuant to USSG § 2K2.1(b)(1)(B). PSR ¶ 47b.

**Possession of Firearms in Connection with Another Felony Offense (+4)**

Because the defendant possessed firearm in connection with the felony offense in Count 1, his Base Offense Level should be increased by four additional levels, pursuant to USSG § 2K2.1(b)(7)(B). PSR ¶ 47c.

Defendant's Adjusted Offense Level on Count 4 is 22.

**Combined Adjusted Offense Level**

Because the defendant was convicted of two counts, defendant's Combined Adjusted Offense Level is determined by using the highest offense level, which is 34. PSR ¶ 47h.

**Acceptance of Responsibility (-3)**

Because the defendant admitted and accepted responsibility, under USSG § 3E1.1, for his unlawful conduct in this case the government will recommend a three-level reduction in his offense level. PSR ¶¶ 49 - 50, Plea Agreement ¶ 16.

Accordingly, with an Adjusted Offense Level of 31 and a Criminal History Category of I, defendant's advisory sentencing guideline range, because there is a 10-year mandatory minimum sentence, is between 120 to 135 months' imprisonment.

The U.S. Probation Office has recommended an upward variance to a sentence of 168 months' imprisonment. Such a sentence is insufficient.

**C. Government's Recommended Sentence.**

Pursuant to 18 U.S.C. § 3553(a), we ask the Court to impose a total sentence, on Count 1, of 210 months' imprisonment, to be followed by a five-year term of supervised release. On

Count 4 we ask the Court to impose a sentence of 37 months' imprisonment, which is the high-end of the advisory guideline range for that charge, to be followed by a three-year term of supervised release, to be served concurrently with the sentence imposed on Count 1.

Given the nature of this case, defendant's advisory sentencing guidelines, the societal harm caused by fentanyl, and the aggravating circumstances involving the defendant's large scale fentanyl distribution operation, his prior drug dealing arrest, his possession of multiple firearms, and his admission that he "distributed fentanyl that resulted in the death of an adult male victim" we believe an upward variance pursuant to 18 U.S.C. § 3553(a) and total sentence of 210 months' imprisonment is warranted, just, and necessary. Such a sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and sends a clear and unequivocal message to those who sell fentanyl that they will be held accountable for the death and destruction they have directly inflicted upon the community.

We ask the Court to leave the issue of restitution open for 90 days.

The defendant was selling fentanyl, an extremely addictive, destructive, and deadly poison that has been devastating the community. According to law enforcement, in 2023 when this death resulted:

> Fentanyl is the primary drug threat in Oregon and Idaho, seized by law enforcement agencies in counterfeit pill, and increasingly, in powder form, as the purity has consistently increased, and prices remain low. Fentanyl was identified as the primary cause of death either alone or with other substances in 51.5% of the drug-related deaths in Idaho during 2023 and 77% of the drug-related deaths in Oregon as of September 2023.

OREGON-IDAHO HIGH INTENSITY DRUG TRAFFICKING AREA (HIDTA) 2025 THREAT ASSESSMENT, June 2024, at 6 (https://oridhidta.org/reports).

The death toll from fentanyl is truly frightening. For Americans aged 18 to 45, overdoses – primarily the result of illicit fentanyl – remain the leading cause of death. *CDC Reports Nearly 24% Decline in U.S. Drug Overdose Deaths*, CDC NEWSROOM (Feb. 25, 2025); *DEA Administrator on Record Fentanyl Overdose Deaths,* GET SMART ABOUT DRUGS (August 17, 2024).

In 2022, within the United States, fentanyl was responsible for an average of more than 200 deaths every day and a total of 73,654 people died from fentanyl overdoses. *Are Fentanyl Overdose Deaths Rising in the U.S.*, USAFACTS (Sept. 27, 2023). Here in Oregon, between 2015 and 2021, Oregon experienced a 932% increase in fentanyl overdose deaths. *Fentanyl by State Report*, FAMILIES AGAINST FENTANYL (Feb. 4, 2023). In 2022, Oregon alone experienced a total of 839 fentanyl related overdose deaths. OREGON HEALTH AUTHORITY OREGON DEPARTMENT OF EDUCATION FENTANYL & OPIOID RESPONSE TOOLKIT FOR SCHOOLS (January 2024).

In 2023, within Oregon there were 1,833 overdose deaths, and of those, 1,272 were the result of synthetic opioids, such as illicit fentanyl. *Oregon Overdose Prevention Dashboard*, OREGON HEALTH AUTHORITY (May 1, 2025). In 2023, "Oregon had the highest rate of increase in fentanyl deaths in the nation with a one-year increase of more than 67[%], compared to a national average of 5[%]." *Oregon, Washington see largest increases in fentanyl deaths since last year*, KPTV 12 (Sept. 26, 2023).

Even with the most recent decreases in overdose deaths, both nationally and in Oregon, "[f]entanyl continues to be the primary cause of drug overdose deaths in the United States," to include here within Oregon. *Fentanyl Continues to Be the Leading Cause of Overdose Deaths. What's Being Done to Combat Trafficking into the United States?,* WATCHBLOG: FOLLOWING

THE FEDERAL DOLLAR, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (Sept. 4, 2025); *Oregon overdose deaths are down, CDC data shows,* OREGON HEALTH AUTHORITY (May 16, 2025) (While "Oregon's overdose deaths decreased 22% between December 2023 and December 2024, a trend similar to that experienced nationwide . . . The count is still much higher than pre-pandemic years, with 1,480 deaths within that one-year time span, CDC data show."); *U.S. Overdose Deaths Decrease Almost 27% in 2024,* NATIONAL CENTER FOR HEALTH STATISTICS, U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC) (May 14, 2025) (https://www.cdc.gov/nchs/pressroom/ releases/20250514) (in 2024 "there were there were an estimated 80,391 drug overdose deaths in the United States – a decrease of 26.9% from the 110,037 deaths estimated in 2023" and of those deaths, in 2023, 76,282 involved synthetic opioids (fentanyl) and in 2024, 48,422 involved synthetic opioids (fentanyl)).

The defendant was selling death and destruction. He was selling an extremely deadly poison – a poison being sold to people who were struggling with – and too frequently losing to – their addictions. We understand the defendant is young and came to the United States to seek greater opportunities than he had in Honduras and his journey was long and treacherous. Such a desire to come to the United States is understandable. America has long stood as a bastion of freedom, democracy, and opportunity for people all around the world. The Statute of Liberty welcomes immigrants with the poem:

> Not like the brazen giant of Greek fame,
> With conquering limbs astride from land to land;
> Here at our sea-washed, sunset gates shall stand
> A mighty woman with a torch, whose flame
> Is the imprisoned lightning, and her name
> Mother of Exiles. From her beacon-hand
> Glows world-wide welcome; her mild eyes command
> The air-bridged harbor that twin cities frame.
> "Keep ancient lands, your storied pomp!" cries she

> With silent lips. "Give me your tired, your poor,
> Your huddled masses yearning to breathe free,
> The wretched refuse of your teeming shore.
> Send these, the homeless, tempest-tost to me,
> I lift my lamp beside the golden door!"

Emma Lazarus (1903). *The New Colossus* [Bronze plaque]. Statue of Liberty National Monument, Liberty Island, NY. (Original work written 1883).

Every year hundreds if not thousands of immigrants enter this very courthouse to be sworn in as new United States citizens. They have applied to be citizens, they have studied to be citizens, and they have gone through a hard and lengthy process to earn the privilege to stand before a federal judge and take an oath and become U.S. citizens and actively contribute to the community. Unfortunately, the defendant did not come here legally and at some point he decided to start making money by selling fentanyl – he took the easy path and made a fateful choice that has contributed to the destruction these drugs have unleashed upon the community and also helped set in motion a series of tragic events that culminated in the death of Preston. Even at the early age of 16 the defendant was arrested in Oakland, California for possessing fentanyl for purposes of sale. PSR ¶ 57.

As this case tragically shows, every time the defendant sold fentanyl, he perpetuated the cycle of addiction and also risked selling the person a poison that could kill them or their customers. The extraordinary lethality of fentanyl is truly frightening. But the defendant simply did not care. The defendant prioritized making money for himself over the dangers he posed to his customers.

Accordingly, after evaluating the competing sentencing factors outlined in 18 U.S.C. § 3553(a) which include the nature and circumstances of the offense; the defendant's characteristics; the need for the sentence imposed to reflect the seriousness of the offense; the

need for the sentence to promote respect for the law; the need for the sentence to afford adequate deterrence to criminal conduct; the need for the sentence to provide just punishment for the offense; the need to protect the public from further crimes of the defendant; and, the need to provide the defendant with needed training or other corrective treatment, we ask the Court to impose an upward variance from the defendant's otherwise advisory sentencing guideline range and impose a total sentence of 210 months' imprisonment, to be followed by a five-year term of supervised release. The scope of defendant's drug dealing and the lethality of it, to the community and to Preston, makes such a sentence reasonable, just, and absolutely warranted. We ask the Court to impose it.

At the time of sentencing we anticipate that Preston's mother and his fiancée will ask to address the Court. Both are also submitting letters which we will forward to the Court. Since the government agreed to forgo moving forward with an enhanced charge for distribution resulting in death, the defendant has agreed that all victims' rights pursuant to 18 U.S.C. § 3771 apply in this case. Plea Agreement ¶ 15. We also ask the Court to leave open the issue of restitution for 90 days.

At the time of sentencing we ask that the Court dismiss Counts 2 and 3.

Following his time in custody, the defendant will likely be deported to Honduras.

Dated: October 28, 2026.

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

/s/ Scott Kerin

SCOTT M. KERIN, OSB # 965128
Assistant United States Attorney